IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| MARCUS ALEX CASH, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | NO. 3:22-CV-81 |
| CENTRAL INTELLIGENCE AGENCY, | : | |
| | : | |
| Respondent. | : | |
| _____ | : | |

## ORDER GRANTING MOTION TO UPHOLD FINAL JUDGMENT OF MSPB AND FOR SUMMARY JUDGMENT

This "mixed case"[1] is before the Court for judicial review of the Merit System Protection Board's ("MSPB") final decision upholding the Central Intelligence Agency's (the "Agency") denial of *pro se* Petitioner Marcus Alex Cash's application for disability retirement benefits and his disability discrimination claims. Currently pending before the Court are the Agency's Motion to Uphold the Final Judgment of the MSPB and for Summary Judgment; and Petitioner Cash's "Motion for Partial Summary Judgement on Full Retirement Annuity," Motion in Limine to exclude and strike all testimony of Dr. Mario F., Motion for *De Novo* Standard of Review, and "Motion for Partial Summary Judgment Granting approval of FERS-MDR Application." For the reasons stated below,

---

[1] When a federal employee suffers a qualifying adverse employment action appealable to the Merit Systems Protection Board ("MSPB") and attributes the federal agency's decision to unlawful discrimination, the employee has what is known as a "mixed case." *Perry v. MSPB*, 582 U.S. 420, 422 (2017); 29 C.F.R. § 1614.302.

the Agency's Motion [Doc. 22] is **GRANTED**, and Petitioner's Motions [Docs. 25, 31, 41, and 45] are **DENIED**. Thus, the MSPB's decision denying Petitioner's disability retirement application is **AFFIRMED**, and the Agency is entitled to summary judgment on Petitioner's discrimination claims because Petitioner failed to administratively exhaust his claims.

## BACKGROUND

Petitioner, a former employee of the Agency, seeks review of the decision by the Merit Systems Protection Board ("MSPB")[2] upholding the Agency's denial of his application for disability retirement and denying his disability discrimination claims under the Rehabilitation Act.[3] Petitioner contends the Agency wrongfully denied his application for medical disability retirement ("MDR") for his stated disabling conditions of post-traumatic stress disorder ("PTSD"), panic disorder, anxiety, severe episcleritis, extreme sensitivity to environmental heat, claustrophobia, and depression/grief.

Petitioner holds a Doctorate in Electrical Engineering and began his employment with the Agency as a Science & Technology Analyst on April 17, 2005.[4] At the time Petitioner resigned from the Agency in October 2014, he was a Technical Intelligence Officer (Systems Engineer) wherein he provided technical support to the Agency on

---

[2] "The MSPB is an independent, quasi-judicial agency in the Executive branch that serves as the guardian of Federal merit systems." https://www.mspb.gov/about/about.htm (visited September 27, 2023).

[3] *Cash v. CIA*, 2022-1852 (Fed. Cir. 2022).

[4] Doc. 22-4, p. 11.

systems utilized to perform the Agency's mission.[5] Petitioner worked in the Washington D.C. Metropolitan Area ("WMA") throughout his career, but he would have to travel and was deployed to overseas stations, including war zones; he also worked in SCIFS.[6]

Plaintiff states his disabling conditions stem from a five-day deployment in a war zone overseas in February 2009, where he suffered a "traumatic incident regarding travel that dramatically affected" him[7] and caused him to have panic attacks, claustrophobia, and post traumatic stress disorder ("PTSD"). The Agency had no medical record or cable documentation at that time reporting on any such event.[8] Petitioner was never referred for a Fitness for Duty evaluation or out of the workplace for a medical reason for which he could have been referred for a Fitness for Duty evaluation.[9] Petitioner successfully completed other temporary duty assignments (TDYs) "without incident,"[10] received "EXCELLENT – EXCEEDED ALL THE KEY BEHAVIORS" annual performance evaluations for August 1, 2010 – July 31, 2011, and for August 1, 2011 – July 31, 2012;[11] and received awards for exceptional performance and meritorious unit citations in 2011 and 2012.[12] Petitioner took a personal trip to Israel for 12 days in November 2012.[13]

---

[5] Doc. 22-5, p.17; Doc. 22-4, p. 16.
[6] Doc. 22-4, p. 16. A SCIF is a Sensitive Compartmented Information Facility, a secure place where sensitive information can be viewed by government officials.
[7] Doc. 22-11, p. 20.
[8] Doc. 22-11, pp. 19 ¶(C), 20; Doc. 22-13, p. 19.
[9] Doc. 22-11, p. 20.
[10] *Id.* at p. 18.
[11] Doc. 22-5, pp. 6-17.
[12] Doc. 22-13, p. 36.
[13] Doc. 22-17, pp. 12-

Both of Petitioner's parents died within a month of each other in 2012.[14] Also in 2012, Petitioner was under the care of Dr. Hernandez and receiving treatment for panic disorder.[15] In November 2012, Dr. Hernandez verified he was treating Petitioner for "Claustrophobia aggravated by war-zone TDY,"[16] and in December, Petitioner requested the Agency give him an accommodation for upgraded air travel.[17] On December 28, 2012, the Agency granted his accommodation request and upgraded Petitioner's air travel from economy class to business class.[18] His "Agency travel clearance remained Worldwide Qualified Without Restriction[.]"[19]

On March 5, 2013, Petitioner emailed the Agency's Retirement Branch and requested to retire, effective September 3, 2013. He stated:

> I have some extenuating long-term circumstances with my immediate family who reside in SC/GA and need to request a hardship waiver for retirement/separation unless the Agency can provide P/T employment for me while I reside there. . . .
>
> Both of my parents deceased last year . . . and not only am I handling their very-complicated estate, but also the welfare and a trust for my mentally-handicapped brother. My father-in-law (in Atlanta) has been diagnosed with Parkinson's, and will inevitably require the help of my wife and I.
>
> I have found it increasingly impossible to manage these responsibilities while living in WMA. I have drained my leave over the past year on elder care issues, and even had to seek help [sic] medical help for persistent anxiety. I have requested telecommuting work from my office, and also

---

[14] Doc. 22-19, p. 5, ¶9.

[15] Doc. 22-13, p. 7.

[16] *Id.*

[17] Doc. 22-11, p. 18, ¶(C); Doc. 3-8, p. 2.

[18] Doc. 22-13, p. 6.

[19] Doc. 22-11, p. 18, ¶(C).

sought new positions [redacted], but nothing has materialized yet. Routine office-funded TDY travel back and forth between SC/GA and WMA is an option, but could get expensive. Due to my kids needs to transition during school break, I have to make a move this summer to position myself. My intent is to relocate to Athens, GA where I am close enough to attend to these issues a few days a week, but not so close as to become a crutch (especially for my brother). If I don't step in, my brother and father-in-law will likely become a state liability.

There is no one else in my or my wife's family to handle these responsibilities, and I also have three children. I cannot afford to live in WMA while working P/T out of necessity. The immediate retirement would provide a nominal income, and FEHB eligibility for my family's benefit. I would hope to be able to return to the federal workforce in the future.[20]

The Agency responded, informing Petitioner he would be eligible to retire with a full retirement annuity on June 25, 2027.[21] Petitioner also emailed a manager in his chain of command, Sergio M., to "give [him] an update on [Petitioner's] personal situation."[22] Petitioner stated, "I am facing a family crisis that is going to force me to move and will affect my availability to work here full-time [redacted] for possibly up to a year, beginning this summer."[23] He stated that he was searching for a way to avoid a "hard separation from the Agency" and asked Sergio M. to let him know if Sergio M. was "aware of other options."[24] Petitioner stated, "I am a participant in the leave bank, but I would feel guilty applying for that since this is a family versus a personal medical

---

[20] Doc. 22-7, p. 5.
[21] Doc. 22-7, p. 6.
[22] Doc. 22-7, p. 4.
[23] *Id.*
[24] *Id.*

problem."[25]

In March 2013, Petitioner requested a year of Leave Without Pay ("LWOP") to begin on June 1, 2013, stating that "[t]he recent death of both of my parents has created family demands that I can no longer adequately address, ad-hoc, while routinely commuting to South Carolina."[26] He stated that he intended to live in Athens, Georgia, "a geographical compromise between vicinity to [his] executor/trustee duties in S[outh] C[arolina], additional elder care issues (in-laws) in GA, lower cost of living with decent schools, and probable (external) part-time work in the Atlanta or Athens area."[27] He "intend[ed] to return to Agency full-time work in Summer 2014."[28] Finally, he stated that he "welcome[d] options to continue work part-time[.] If this is not possible, I plan to pursue part time work (e.g., adjunct faculty at UGA or Georgia Tech) to support my family. For contingency purposes, I have submitted a broadly-scoped outside activities related request, and have investigated my deferred retirement options."[29]

Also in March 2013, Petitioner contacted the Agency's Employee Assistance Program ("EAP") "with reports of increased panic attacks, increased anxiety and his plan to take LWOP for one year based on family circumstances that have impacted his ability to function effectively at work."[30]

---

[25] *Id.* (emphasis added).
[26] Doc. 22-8, p. 11.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] Doc. 22-11, p. 22.

In April 2013, Petitioner began seeing Dr. Robin Anderson "in individualized psychotherapy . . . for anxiety and a specific phobia he developed while employed overseas."[31] Petitioner also met with a representative from the Agency's EAP "regarding both [his] traumatic war zone experience [in 2009], [ ] the recent death of both [his] parents[, ] the duty of establishing and administering a testamentary trust for [his] mentally disabled brother . . .[and] provid[ing] elder care for [his] father-in-law."[32] The EAP representative encouraged him to apply for medical leave with the Agency's Medical Leave Bank ("MLB").[33]

Dr. Anderson diagnosed Petitioner with "Specific Phobia, Situational Type" and "Extreme Family Stressors" and wrote his prognosis was "Good."[34] Dr. Anderson wrote a note to the MLB in support of Petitioner's MLB application stating that "[h]is symptoms [of anxiety and a specific phobia] have not significantly impacted his ability work but have greatly increased his overall level of stress. Compounding these anxieties, [Petitioner] lost both of his parents in the last 1 ½ years and he is executor of their estate." She stated that Petitioner was taking medications for anxiety and depression, and she would be seeing him weekly until June, when he left for Georgia.[35] Dr. Anderson recommended that Petitioner "be granted medical leave to help him through this difficult

---

[31] Doc. 22-15, p. 12.

[32] Doc. 22-15, p. 23.

[33] *Id*.

[34] Doc. 22-11, p. 23.

[35] *Id.* (emphasis added).

time in his life and ensure that he can fully contribute his best personally and professionally."[36] In May 2013, Petitioner applied to use Medical Leave Bank hours for his medical condition, but his application was denied "based on [Dr. Anderson's] note stating 'symptoms do not significantly impact ability to work.'"[37]

The Agency granted Petitioner's request for a year of LWOP, and in June 2013, Petitioner began LWOP status at the Agency.

In January 2014, Petitioner applied for Social Security Disability Benefits.[38] As part of the application process, an adjudicator at the Georgia Department of Labor Disability Adjudication Services referred Petitioner to Dr. Richard Bank for a psychological evaluation to assess PTSD, severe claustrophobia, environmental/heat sensitivity, panic disorder, and depression as part of his application.[39] In March 2014, Dr. Bank evaluated Petitioner and found that his symptoms were consistent with a diagnosis of Major Depressive Disorder, and he met the criteria for PTSD.[40] Dr. Bank concluded that "[b]ased on the length and severity of his mental health issues, it is possible that [Petitioner's] current status of emotional symptoms could improve in a year or less given appropriate psychological and/or psychiatric treatment."[41]

---

[36] *Id.*

[37] Doc. 22-15, pp. 5, 9-15.

[38] Doc. 22-3, p. 19. On April 12, 2017, Petitioner received a fully favorable decision on his social security disability application, finding Petitioner had been under a disability as defined by the Social Security Act since June 1, 2012. [Doc. 49].

[39] Doc. 22-3, p. 10.

[40] Doc. 22-3, p. 13.

[41] Doc 22-3, p. 14.

It appears Petitioner first attempted to apply for medical disability retirement ("MDR") with the Agency in March 2014.[42] But his application could not be considered because he was still employed.[43]

Petitioner's one-year approved LWOP expired in June 2014. On June 12, 2014, the Agency's EAP closed Petitioner's case relating to his therapy sessions with Dr. Anderson and stated, "if he would like to reactivate his sessions, he can do that upon his return to WMA."[44] The closing case summary stated that "[a]t last report, PT continued to function well in Georgia and was not in need of treatment."[45]

In August 2014, Petitioner notified the Agency's Human Resources department that he was not able to return to his former position.[46] Petitioner states that he was not offered any accommodation or alternative, but nothing in the record shows that he requested any accommodation or alternative position. On August 6, 2014, Petitioner emailed the Retirement Operations Center at the Office of Personnel Management ("OPM") and asked that they "re-process" his disability application.[47] Again, OPM informed Petitioner that it did not accept applications for retirement benefits from employees "that are still on the agency rolls (includes being in a leave without pay

---

[42] Doc. 22-3, p. 5-6.
[43] Doc. 22-6, p. 14.
[44] Doc. 22-9, pp. 4-5.
[45] *Id.* at p. 5.
[46] Doc. 22-6, p. 15.
[47] *Id.*

status)[.]"[48] Thus, Petitioner was instructed to contact Human Resources for instructions to file for disability retirement.

On October 6, 2014, Petitioner resigned from the Agency.[49] Petitioner states Human Resources "asked that [he] resign and that he would be granted [medical disability retirement.]"[50] On October 16, 2014, Petitioner submitted his application for medical disability retirement.[51] In support of his application, Petitioner submitted his psychological evaluation from Dr. Bank as part of his social security disability benefits application in March 2014;[52] a letter from the Social Security Administration showing that he had completed an application for social security disability benefits;[53] and the Social Security Adult Disability Report showing Petitioner's doctors and healthcare providers as Dr. Hernandez and Dr. Anderson in 2012 and 2013 for PTSD, panic disorder, anxiety, and depression.[54]

The application was then forwarded to the Office of Medical Services ("OMS") for review. On November 13, 2014, Dr. Mario F., a licensed psychiatrist employed by the Agency for 20 years, reviewed Petitioner's application.[55] Dr. Mario F. noted that Petitioner's application "notes PTSD and anxiety but his 'Physician's Statement' is not

---

[48] Doc. 22-6, p. 16.
[49] Doc. 22-6, p. 12.
[50] Doc. 22-10, p. 8, ¶ 9.
[51] Doc. 22-3, pp. 5-17.
[52] Doc. 22-3, pp. 10-14.
[53] Doc. 22-3, p. 19.
[54] Doc. 22-3, pp. 18-27.
[55] Doc. 22-4, pp. 24-25

from a treating provider but rather from a State of Georgia Dept. of Labor Adjudicator to whom he reported a history of PTSD. The Adjudicator did not report the nature of his symptoms, the diagnostic criteria met, or the treatment he received."[56] Petitioner "did relate his PTSD to his Agency warzone service, but review of his Employee BIO shows that his only warzone service was 5 days in late February 2009," and "even the Adjudicator who did not have access to this information notes, 'it is possible that his current status of (unspecified) emotional symptoms could improve in a year of less. . . .'"[57]

Dr. Mario F. reviewed Petitioner's records which showed "only that he had several panic attacks in response to stress but did not document any specific exposure to dangerous or threatening circumstances or ongoing anxiety such that a diagnosis of Generalized Anxiety or Panic Disorder was rendered."[58] Dr. Mario F. recommended that Petitioner's application be disapproved because "Disability does not appear to have been established."[59] Petitioner "did not include any statement from a treating provider"; the Georgia Department of Labor Adjudicator reported that Petitioner "told him he was afflicted with PTSD since his warzone experience but record review reveals that he served for 5 days in (redacted) in 2009 and there are no cables that reflect that he was in any danger during this period"; there was "no history prior to his resignation that [Petitioner]

---

[56] *Id.* at p. 24.

[57] *Id.*

[58] *Id.*

[59] *Id.* at p. 25.

was disabled and couldn't work"; and Petitioner "told OMS/EAP in 2012 that he was moving to the Atlanta area because in the wake of his parent's death he needed to be in the area to manage their estate."[60]

In December 2014, OMS reviewed Petitioner's application and, like Dr. Mario F., recommended it be denied based on review of Petitioner's medical documentation which "consisted only of an evaluation 03/07/2014 by a Clinical Psychologist Adjudicator at the Georgia Department of Labor as part of his application for SSI benefits"; "[n]o specific exposure to 'actual or threatened death or serious injury' was noted during his warzone service in 2009 when Petitioner said the traumatic stress originated"; the Adjudicator concluded Petitioner's ability "to respond to normal work stressors is moderately limited," and "it is possible that his current status of (unspecified) emotions symptoms could improve in a year or less given appropriate psychological and/or psychiatric treatment"; and Petitioner failed "to present a medical statement from a current treating physician or mental health professional detailing his specific symptoms, diagnosis, and a sequence of attempted treatment interventions that concluded with a finding that he was unable to work."[61]

The Agency's Coordinator for Employment of the Handicapped also reviewed Petitioner's application for medical disability retirement "to determine if reasonable accommodation will enable the employee to perform fully successful service in his or her

---

[60] *Id.*

[61] Doc. 22-4, p. 29.

current position or whether a vacant position is available in the agency[.]"[62] The Coordinator found Petitioner's "condition [did] not require accommodation" because "[m]edical information provided to the agency does not document a disabling medical condition[,]" and the Agency "did not reassign the employee to the vacant position(s) in the agency" because Petitioner "did not request re-assignment."[63]

On July 13, 2015, the Agency informed Petitioner it "must deny [his] application" because "the documentation submitted in support of [his] application was not sufficient to the findings required by law" that he was disabled.[64] On July 28, 2015, Petitioner appealed the decision. Petitioner submitted additional evidence which included "approximately 100 pages of miscellaneous documents from various phases of his life, 60 empty medication bottles (2014 & 2015) with some [of] their accompanying pharmacy literature, and 103 pages of his outpatient Kaiser-Permanente medical record 2009-2013 where he did report panic attacks in relation to his parents' medical decline and their eventual deaths."[65]

On April 11, 2016, the Agency completed its review and denied Petitioner's appeal because "it was not possible for the Agency to conclude that [he] met the eligibility criteria listed in 5 C.F.R. 844.103(a)(2)-(5)."[66]

---

[62] Doc. 22-4, p. 31.
[63] *Id.* at pp. 31-32.
[64] Doc. 22-10, p. 5.
[65] Doc. 22-11, p. 18.
[66] Doc. 22-11, p. 29.

<u>Petitioner's Complaint of Discrimination to the EEO and MSPB Appeal</u>

In June 2010 and December 2011, Petitioner attended the Agency's "Zero Tolerance Policy (No Fear Act)" training, where he was informed "on the necessity of making contact with a[n EEO] counselor within forty-five (45) days of an alleged incident of discrimination/harassment."[67]

On November 18, 2015, 127 days after the Agency denied his MDR application on July 13, 2015, Petitioner contacted the Agency's Office of Equal Employment Opportunity ("EEO") with complaints of employment discrimination based on his disability and entered into pre-complaint counseling.[68] No evidence reflects Petitioner presented "any arguments or evidence, persuasive  or otherwise, warranting an extension of the time limit for initiating EEO counselor contact in connection with any of the[ ] alleged incidents."[69]

On February 22, 2016, Petitioner filed a formal complaint with the EEO, alleging unlawful employment discrimination in violation of the Rehabilitation Act.[70] The EEO issued its Final Agency Decision ("FAD") on April 6, 2016, dismissing Petitioner's complaint as untimely because he failed to initiate contact with an EEO counselor within 45 days of the date of the discriminatory incident.[71]  On June 21, 2016, Petitioner appealed

---

[67] Doc. 22-14, pp. 6-7.

[68] *Id.* at p. 5.; Doc. 3-2, p. 9.

[69] Doc. 22-14, p. 7.

[70] Doc. 3-1, p. 4.

[71] *Id.*

the FAD to the Equal Employment Opportunity Commission Office of Federal Operations ("EEOC-OFO").[72] On March 7, 2017, the EEOC-OFO dismissed Petitioner's appeal as untimely because Petitioner failed to file the appeal within 30 days of receipt of the FAD.[73]

Separate from his discrimination claims, Petitioner also appealed the Agency's decision to deny his MDR application, which, as discussed above, the Agency denied on April 11, 2016.[74]

On May 11, 2016, Petitioner filed an appeal to the MSPB and requested a hearing.[75] On December 8, 2016, after completion of discovery, an Administrative Judge ("ALJ") held a hearing.[76] Petitioner's supervisor from August 2011 to June 2013 testified at the hearing that Petitioner was not required to work in confined spaces as part of his regular work duties; Petitioner never informed him that he had PTSD during his employment at the Agency; he did not observe any decline in Petitioner's work performance; and Petitioner never asked for an accommodation, but if he had, his supervisor would have worked to provide it.[77]

Dr. Mario F. also testified at the hearing. Dr. Mario F. stated his office was involved in accommodating the medical conditions of Agency employees; his efforts to

---

[72] Doc. 3-3, p. 1.
[73] *Id.*
[74] Doc. 22-11, p. 29; Doc. 3-7, p. 5.
[75] Doc. 22-12, pp. 1-3.
[76] Doc. 3-8, p. 1.
[77] *Id.* at pp. 7-8.

accommodate were "creative, open, and occur daily," "his office strives to do it well," and they were "proud of their record to accommodate."[78] He stated that had Petitioner sought an accommodation, "the agency would have engaged with [Petitioner's] healthcare providers and found use for his formidable expertise."[79] Dr. Mario F. testified that accommodations were available and had been initiated for employees with Petitioner's stated medical issues including sensitivity to heat, agoraphobia, claustrophobia, and PTSD, and he gave specific examples of the accommodations.[80]

On January 5, 2017, the ALJ issued an initial decision affirming the Agency's denial of Petitioner's MDR application and finding Petitioner failed to prove the Agency discriminated against him on the basis of any disability when it denied his application.[81] The ALJ found Petitioner "did not present any evidence that meaningfully dispute[d] Dr. Mario F.'s testimony or evidence that otherwise raise[d] an inference of disability discrimination."[82] The ALJ found "compelling evidence that the agency would have attempted to accommodate [Petitioner] had he been forthcoming about his conditions and required accommodation prior to resigning."[83]

On April 14, 2022, the MSPB issued its final order affirming the ALJ's initial

---

[78] *Id.* at pp. 9-10.
[79] *Id.*
[80] *Id.*
[81] *Id.* at pp. 1-17.
[82] *Id.* at p. 17.
[83] Doc. 3-4, p. 4.

decision.[84] Petitioner appealed the final order to the United States Court of Appeals for the Federal Circuit, which then transferred the matter to this Court.[85]

## ANALYSIS

"The Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 1101 *et seq.*, establishes a framework for evaluating personnel actions taken against federal employees."[86] Under the CSRA, an employee has a right to appeal a federal agency's serious personnel action to the MSPB.[87] And "[w]hen an employee complains of a personnel action serious enough to appeal to the MSPB and alleges that the action was based on discrimination, she is said (by pertinent regulation) to have a 'mixed case.'"[88] If, as is the case here, "the MSPB decides against the employee on the merits of a mixed case, the statute [5 U.S.C. § 7703(b)(2)] instructs her to seek review in federal district court under the enforcement prison of the relevant antidiscrimination law."[89]

## I.  Review of Final Order of MSPB

"When a federal employee brings a 'mixed case' appealing an adverse personnel action from the MSPB and raising claims of discrimination, [the court] reviews the non-discrimination claims on the administrative record using an arbitrary and capricious

---

[84] Doc. 3-4, p. 1-11.

[85] Doc. 1-13.

[86] *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012).

[87] *Id.*

[88] *Id.* (citing 29 CFR § 1614.302).

[89] *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 426 (2017) (citing 5 U.S.C. § 7703(b)(2) and *Kloeckner*, 568 U.S. at 56, n. 4).

standard."[90] "The MSPB's findings or conclusions may only be set aside if they are (1) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (2) obtained without procedures required by law, rule or regulation having been followed; or (3) unsupported by substantial evidence."[91] "'Along the standard of review continuum, the arbitrary and capricious standard gives [a] court the least latitude in finding grounds for reversal.'"[92] The Court "must only consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment."[93]

Here, the Court has thoroughly reviewed the administrative record and finds the MSPB decision was not arbitrary, capricious, or otherwise not in accordance with the law or required procedures; nor was it unsupported by substantial evidence. Indeed, the decision was well reasoned and supported by substantial evidence.

To be eligible for a disability retirement annuity, an employee must establish by a preponderance of the evidence that: (1) he completed at least 18 months of creditable civilian service under the Federal Employees' Retirement System ("FERS"); (2) while

---

[90] *Harris v. Secretary, U.S. Dep't of the Interior*, 2022 WL 13711597, at 3 (11th Cir. 2022) (quoting *Kelliher v. Veneman*, 313 F.3d 1270, 1274-75 (11th Cir. 2002)). As such, Plaintiff's Motion to review the MSPB's final order *de novo* [Doc. 41] is **DENIED**.

[91] *Id.* (citing 5 U.S.C. § 7703(c)).

[92] *Baker v. Sec'y, U.S. Dep't of Transp.*, 452 F. App'x 934, 937 (11th Cir. 2012) (quoting *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990)).

[93] *Kelliher*, 313 F.3d at 1276 (citation and internal quotation marks omitted).

employed in a position subject to FERS, he became disabled because of a medical condition, resulting in a deficiency in performance, conduct or attendance, or, if there is no such deficiency, the disabling medical condition is useful and efficient service or retention in the position; (3) the disabling medical condition is expected to continue for at least one year from the date that the application for disability retirement benefits was filed; (4) accommodation of the disabling medical condition in the position held must be unreasonable; and (5) the employee did not decline a reasonable offer of reassignment to a vacant position.[94]

At the administrative hearing, the parties stipulated that the first and fifth factors of 5 C.F.R. § 844.103(a) were satisfied[95]; the ALJ presumed, without deciding, that Petitioner had established the second and third factors[96]; but the ALJ ultimately found that Petitioner failed to satisfy the fourth factor because the Agency "presented compelling evidence that it could have accommodated the appellant"[97] and upheld the Agency's denial of Petitioner's application for disability retirement benefits. Thus, the only issue in this appeal

---

[94] 5 C.F.R. § 844.103(a).

[95] MSPB Initial Decision by Administrative Judge Sprague [Doc. 3-8, p. 6].

[96] *Id.* at pp. 6-7 ("Presuming, without deciding, that the appellant's asserted conditions of PTSD, panic disorder, anxiety, extreme sensitivity to environmental heat, claustrophobia, and depression/grief are disabling medical conditions that are incompatible with either useful and efficient service or retention in the position and that this disabling medical condition is expected to continue for at least one year from the date that the application for disability retirement benefits was filed . . . .").

[97] *Id.* at p. 7.

is whether the ALJ's finding that the Agency could have accommodated Petitioner is arbitrary, capricious, or unsupported by substantial evidence.[98] The Court finds the ALJ's finding is reasonable and supported by substantial evidence.

The ALJ relied on evidence from Petitioner's supervisor who testified that Petitioner never informed him he had PTSD or any difficulty working in an office setting; he did not recall Petitioner ever having any issues with drowsiness or lack of focus; and he did not observe any decline in Petitioner's work performance. Moreover, Petitioner's supervisor testified that the Agency held Petitioner's position open while he was on LWOP, and if Petitioner would have returned to the Agency from LWOP and informed his supervisor of his medical conditions, the supervisor would "have assessed the situation and worked with the [Petitioner] to accommodate him,"[99] including altering the specific work duties or environment in coordination with the Agency's reasonable accommodations office, human resources, and higher-level management.[100] Petitioner's supervisor stated that Petitioner worked in a "lab-based environment"; Petitioner was not required to work in confined spaces as part of his regular work duties, and his work in confined spaces could have been accommodated wither by having the work done in that confined environment by different

---

[98] Because the ALJ presumed Petitioner had a qualifying disability, Petitioner's challenges that the Agency failed to properly consider evidence of his purported medical disability are MOOT.
[99] MSBP Initial Decision, p. 7.
[100] *Id.* at p. 8.

agency personnel or through reassignment because the agency would have employed Petitioner's expertise in other areas needed by the Agency; his employees were not required to perform field visits; that employment under his supervision did not require adherence to a rigid schedule; he encouraged use of encrypted video teleconference communication for long distance meetings instead of airline travel; if Petitioner had properly communicated to him, "he could have worked easily through any lateness caused by either the [Petitioner's] medical conditions or the appellant's medications for those conditions, [ ] he would have accommodated the [Petitioner's] napping . . . through schedule adjustments, [and he] generally would have worked with the [Petitioner] if he needed to leave the office in order grieve"; that although the classified nature of the work did not permit telework, he himself was able to work at an alternate location to reduce his commute and believed the same flexibility should be extended to the employees he supervised and part-time work was available.[101]

The ALJ also relied on evidence from Dr. Mario F. who testified that his office was involved with accommodating medical conditions of Agency employees, and their efforts to accommodate were "creative," "open," occurred "daily," and they were "proud" of their record to accommodate Agency employees.[102] Dr. Mario F. testified that an employee

---

[101] *Id*. at pp. 7-9.
[102] *Id*. at p. 9.

with PTSD "could, with symptom appropriate treatment, perform the functions of a Systems Engineer," and had Petitioner "sought an accommodation from the [A]gency, the [A]gency would have engaged with [Petitioner's] healthcare providers and found use for his 'formidable expertise' while simultaneously minimizing 'triggers' of the [Petitioner's] anxiety."[103] In addition, Dr. Mario F. stated that "for agency employees who could no longer be engaged in a security or para-military role due to their PTSD, the [A]gency would employ the reasonable accommodations process in order to reassign the employee to a position in which they could serve effectively."[104] As to Petitioner's specific medical conditions, Dr. Mario F. stated that the Agency accommodates heat sensitivity by coordinating with an industrial hygienist to redirect airflow or moving an employee to a private office space with adequate ventilation; accommodates agoraphobia by relocating employees to a floor sufficiently close to or at ground level, so the employee does not have to use an elevator or stairwell; accommodates employees with claustrophobia and those working in a closed SCIF environment, like Petitioner, by moving them into other offices, buildings, and locations; accommodates panic disorder in highly personalized ways and for panic attacks during traffic jams by accommodating commutes.[105] He acknowledged

---

[103] *Id.*

[104] *Id.*

[105] *Id.* at pp. 9-10.

that while not all attempted accommodations are successful, the Agency "seeks to use the employee's expertise 'as best it can' given the employee's medical limitations, up to and including reassignment, and that, had the appellant come forward prior to resigning and requested an accommodation, the [A]gency would and could have accommodated him – especially given the [Petitioner's] exemplary performance record."[106]

The ALJ addressed Petitioner's arguments that the Agency could not have accommodated his medical conditions finding that Petitioner had failed to provide any medical evidence to support his broad assertions and failed to dispute the Agency's evidence. Moreover, because Petitioner resigned before requesting any accommodation, the Agency had no opportunity to engage him in the interactive accommodations process. The ALJ wrote that Dr. Mario F.'s testimony left him "with the firm conviction that the CIA takes its obligation to accommodate its employee's medical conditions <u>very seriously</u> and would have accommodated the [Petitioner] – either through an adjustment to his work/commuting environment, or if those efforts failed to ameliorate his conditions, through a reassignment."[107] Thus, the ALJ found there was "no reasoned medical or lay

---

[106] *Id.* at p. 10.
[107] *Id.* at pp. 11-12.

explanation as to why the [Petitioner] could not have performed the essential functions of his position despite his medical conditions with the aid of appropriate treatment."[108]

Petitioner essentially argues that the ALJ unreasonably relied on the testimony of Dr. Mario F., who did not personally evaluate Petitioner, and the ALJ failed to properly consider his medical evidence and administrative records. Petitioner contends Dr. Mario F.'s options for accommodation were "completely ridiculous and not remotely applicable to Petitioner," but he points to no evidence discrediting Dr. Mario F.'s testimony. The ALJ reasonably relied on Dr. Mario F.'s 20 years' experience in accommodating other Agency employees and Petitioner's supervisor's testimony to find that the Agency could have accommodated Petitioner. The Court finds no clear error; the evidence at the MSPB hearing substantially supports the Agency's denial of Petitioner's disability retirement application.

Thus, the Court **AFFIRMS** the MSPB's final decision. As such, Petitioner's Motion for Partial Summary Judgment on Full Retirement Annuity [Doc. 25], Motion in Limine to strike the testimony of Dr. Mario F. [Doc. 31],[109] and Motion for Partial Summary Judgment Granting Approval of FERS-MDR Application [Doc. 45] are **DENIED**.

---

[108] *Id.* at p. 12.

[109] Petitioner argues the Court should "exclude and strike all testimony, declarations, statements, certifications, and attestations of 'Dr. Mario F.' and all administrative and tribunal findings, judgments, dispositions and decisions made thereupon. Dr. Mario F.'s testimony unjustly, materially and irreparably *prejudiced* the Respondent's MDR processing of the Petitioner's application, and the subsequent MSPB review." Doc. 31, p. 1 (emphasis in original). Petitioner

## II.    Motion for Summary Judgment

Petitioner also claims the Agency discriminated against him based on his disabilities. He claims the Agency violated the Rehabilitation Act by failing to grant him remote or part-time work and therefore to accommodate his disabilities and discriminated against him by denying his disability retirement application. The Court reviews Petitioner's discrimination claims *de novo*.[110] As explained below, Plaintiff failed to exhaust his administrative remedies for these claims: He failed to raise any claim for failure to accommodate him with part-time or remote work with the Agency or the EEO, and he failed to bring his claim for discriminatory denial of his MDR application (or any other discrimination claim) within 45 days of the challenged employment actions.[111] Thus, the Agency is entitled to summary judgment on Petitioner's discrimination claims.

### A. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[112]  A genuine issue of material

---

attacks the credibility of Dr. Mario F.'s testimony before the ALJ. The ALJ properly credited Dr. Mario F.'s testimony.

[110] *See Kelliher*, 313 F.3d at 1274-75.

[111] Petitioner argues this Court previously found Petitioner properly exhausted his administrative remedies. But the Court's September 29, 2023 Order was based on the Agency's Motion to Dismiss because of Petitioner's failure to appeal to the EEOC within the 30 days of the EEO dismissing his claims as untimely, not Petitioner's failure to initiate contact within the 45-day charging period or exhaust a failure to accommodate claim. *See* Order on Motion to Dismiss [Doc. 7].

[112] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[113]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[114]  When ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the party opposing the motion.[115]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[116]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[117]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[118]

As a *pro se* litigant, Plaintiff is held "to a less stringent standard than formal

---

[113] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[114] *See id.* at 249-52.

[115] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[116] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

[117] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.

[118] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

pleadings drafted by lawyers."[119]  Nevertheless, Plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law," including those applicable on summary judgment.[120]

### B. Analysis

A federal employee who alleges both discrimination in violation of the Rehabilitation Act and a qualifying adverse employment action affecting federal civil servants—a "mixed case"—may choose between filling a "mixed case complaint" with his agency's EEO office, or filing a "mixed case appeal" directly with the MSPB.[121] The relevant agency EEO office and the MSPB can and must address both the discrimination claims and the appealable personnel actions.[122] Here, as set forth in detail in the Court's Order on the Agency's Motion to Dismiss, Petitioner filed his case with the Agency's EEO office.

### 1. Failure to Accommodate Claim

"In bringing suit under the Rehabilitation Act, a federal employee must first raise his disability discrimination claim administratively through an internal complaints process within the employing agency."[123] "The purpose of exhaustion is to permit the

---

[119] *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

[120] *Hillemann v. Univ. of Cent. Fla.*, 411 F.Supp.2d 1354, 1358–59 (M.D. Fla. 2004), *aff'd*, 167 F. App'x 747 (11th Cir. 2006) (internal quotation marks omitted).

[121] 29 C.F.R. § 1614.302(b). But he may not file under both. *Id.*

[122] *Id.*

[123] *Ellis v. England*, 432 F.3d 1321, 1324 (11th Cir. 2005) (citing 29 C.F.R. § 1614.106 and *Moore v. Devine*, 780 F.2d 1559, 1562 (11th Cir. 1986)).

department the first opportunity to investigate the alleged discriminatory [ ] practices, and a plaintiff's judicial complaint is limited by the scope of the EEO investigation which can reasonably be expected to grow out of the charge of discrimination[.]"[124] While judicial claims that "amplify, clarify, or more clearly focus the charges made before the agency" are permitted, a plaintiff may not allege new acts of discrimination in a civil action.[125] "Although judicial complaints do not necessarily have to be mirror images of earlier administrative complaints, allegations of new acts of discrimination that are offered as the essential basis for judicial review must nonetheless be presented to the agency."[126] The denial of a reasonable accommodation for a disability is a discrete act of discrimination.[127]

Here, Petitioner failed to raise any claim for failure to accommodate with the Agency. In his formal complaint of discrimination with the Agency filed on February 22, 2016, Petitioner alleged the following claims of discrimination based on disability: (1) failure to promote him from GS-13 to GS-14 during the 2011 to 2013 promotion cycles; (2) failure to notify him of the benefit of disability insurance during his LWOP from June 2013 to June 2014; (3) denial of his disability retirement application on July 13, 2015; and

---

[124] *Basel v. Secr. of Defense*, 507 F. App'x 873, 875 (11th Cir. 2013) (citing *Gregory v. Ga. Dept. of Hum. Res.*, 355 F.3d 1277, 1279-80 (11th Cir. 2004)).

[125] *Id.* at 876 (citing *Gregory*, 355 F.3d at 1280).

[126] *Id.* (citing *Ray v. Freeman*, 626 F.2d 439, 442-43 (5th Cir. 1980)).

[127] *See Abram v. Fulton Cnty. Gov't*, 598 F. App'x 672, 676 (11th Cir. 2015) (holding that each denial of requested accommodation constituted a "discrete act[ ] of alleged discrimination" for purposes of the limitations period).

28

(4) threatening letters sent to him to collect Federal Employee Health Benefit premiums on October 22, 2015.[128] Petitioner never raised a claim for failure to accommodate. Thus, he cannot raise a failure to accommodate claim before this Court, and it must be dismissed because he failed to administratively exhaust it.[129]

### 2. Remaining Discrimination Claims

Because Petitioner filed his "mixed case complaint" with the Agency's EEO office, he was required "to undergo a two-step process to exhaust h[is] administrative remedies: (1) informal counseling with an EEO counselor within 45 days of the challenged employment act, and (2) the filing of a formal complaint with the agency or department within 15 days after the EEO counselor ha[d] issued a notice of final interview."[130] If an employee fails to comply with the 45-day time limit, he cannot litigate such claim in court, as the claim is barred for failure to exhaust administrative remedies.[131]

---

[128] Doc. 3-1.

[129] *Basel*, 507 F. App'x at 877; 29 C.F.R. §§ 1614.105(a)(1), 1614.107(a)(2).

[130] *Hendrix v. Snow*, 170 F. App'x 68, 76 (11th Cir. 2006) (citing 29 C.F.R. §§ 1614.105 and 1614.06).

[131] *See Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008) (per curiam) (holding that "[u]nder . . . the Rehabilitation Act, federal employees are required to initiate administrative review of any alleged discriminatory or retaliatory conduct with the appropriate agency within 45 days of the alleged discriminatory act[, and] when the claimant does not initiate contact within the 45-day charging period, the claim is barred for failure to exhaust administrative remedies."); *Smith v. Secr., United State Dep't of the Army*, 2022 WL1053266, at *2 (11th Cir. April 8, 2022) (affirming dismissal of complaint brought under the Rehabilitation Act because the *pro se* plaintiff failed to contact the agency EEO within 45 days of the alleged discriminatory act); and *Fleck v. Secr. of United States Dep't of Trans.*, 826 F. App'x 782, 785 (11th Cir. 2020) (per curiam) (upholding the district court's grant of summary judgment for failure to exhaust administrative remedies and noting that "nothing [appellant] did before the MSPB could satisfy the requirement – clear under our exhaustion precedent and the pertinent regulations – that he initiate the administrative review process with the EEOC").

The Agency denied Petitioner's MDR application on July 13, 2015.[132] Petitioner did not contact the Agency's EEO until November 18, 2015, 127 days after the Agency denied his petition—well outside the 45-day time limit. Indeed, all of Petitioner's alleged discriminatory incidents occurred well before October 4, 2015—the date that was 45 days from November 18, 2015—and are thus outside the statutory charging period. For example, Petitioner claims the Agency failed to explore the need for accommodations after he applied to the Medical Leave Bank[133]; but Petitioner applied to the Medical Leave Bank before May 2013, over two years before he contacted the EEO.[134] Thus, Petitioner's discrimination claims must be dismissed for failure to exhaust administrative remedies.

## CONCLUSION

For the reasons explained above, the Agency's Motion to Uphold the Final Judgment of the MSPB and for Summary Judgment [Doc. 22] is **GRANTED**; and Petitioner Cash's "Motion for Partial Summary Judgement on Full Retirement Annuity," [Doc. 25], Motion in Limine to exclude and strike all testimony of Dr. Mario F. [Doc. 31], Motion for *De Novo* Standard of Review [Doc. 41], and "Motion for Partial Summary Judgment Granting approval of FERS-MDR Application" [Doc. 45] are **DENIED**.  Thus, the MSPB's decision denying Petitioner's disability retirement application is **AFFIRMED**, and the Agency is entitled to summary judgment on Petitioner's discrimination claims

---

[132] Doc. 22-10, p. 5.

[133] Compl., p. 5, ¶2(I) [Doc. 20].

[134] Doc. 22-15, p. 5.

because Petitioner failed to administratively exhaust his claims.

**SO ORDERED**, this 28th day of March, 2025.

S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT